UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:   Ajax Integrated, LLC,

Case No. 14-30435
Chapter 11

                                    Debtor.

Mary Lannon Fangio in her official capacity
as trustee pursuant to 11 U.S.C. § 1104
of the bankruptcy estate of Ajax Integrated, LLC,

                                    Plaintiff,

Adv. Proc. No. 15-50001

            v.

Vehifax Corporation,

                                    Defendant.

Mary Lannon Fangio in her official capacity
as trustee pursuant to 11 U.S.C. § 1104
of the bankruptcy estate of Ajax Integrated, LLC,

                                    Plaintiff,

Adv. Proc. No. 15-50005

            v.

Signature Financial, LLC,

                                    Defendant.

Appearances:

Edward Y. Crossmore, Esq.
The Crossmore Law Office
115 West Green Street
Ithaca, NY 14850
*Attorney for Plaintiff*

Marco B. Koshykar, Esq.
Nolan & Heller, LLP
39 N. Pearl Street
Albany, NY 12207
*Attorney for Defendants*

### Memorandum-Decision and Order

Plaintiff Mary Lannon Fangio, chapter 11 trustee ("Plaintiff" or "Trustee") of the debtor-estate of AJAX Integrated, LLC ("Debtor") filed separate, related adversary proceedings against Vehifax Corporation ("Vehifax") and Signature Financial, LLC ("Signature") (collectively

"Defendants").[1]  Both actions seek to recharacterize a certain "Commercial Lease Agreement"—

that was  entered into by and between Debtor and Vehifax in June 2013 ("Agreement") and

subsequently assigned to Signature—as a disguised secured transaction and to avoid Defendants'

respective interests in three pieces of equipment that are the subject of the Agreement.[2] Trustee

asserts that her rights trump Defendants' interests in the Equipment under 11 U.S.C. § 544.[3]

Defendants maintain that the Agreement is a true lease.[4] If found to be a secured

transaction, Signature alternatively claims in its fourth counterclaim that it has a first-priority,

perfected security interest in the Equipment superior to the statutory rights of the Trustee.

Defendants assert common counterclaims that seek (1) post-petition lease payments, (2) turnover

of the Equipment's sale proceeds and (3) damages based upon one missing piece of Equipment.

Vehifax claims entitlement to the sale proceeds as "lessor and owner" of the Equipment while

Signature claims it is entitled to the sale proceeds as the "perfected, first-priority secured party."

Defendants moved and Plaintiff cross moved for summary judgment pursuant to Fed. R.

Civ. P. 56 ("Motions"). Discovery was conducted jointly in the actions which involve similar

---

[1] Adv. Proc. No. 15-50001 shall be referred to as the "Vehifax Action," Adv. Proc. No. 15-50005 shall be referred to as the "Signature Action" and Case No. 14-30435 shall be referred to as the "Main Case."

[2] The three items of Equipment are: (1) a 2011 John Deere 410J Backhoe Loader VIN# 1T0410JXCA0194522 ("410J Loader"), (2) a 2011 John Deere 310SJ Backhoe Loader VIN# 1T0310SJAB0196285 ("310SJ Loader") and (3) a 2011 John Deere 329DT Skid Steer VIN# 1T0329DKEBD207483 ("Skid Steer") (collectively, the "Equipment"). (Doc. 24, ¶ 12, Vehifax Action; Ex. C to Doc. 22, Vehifax Action).

[3] Unless otherwise stated, all sectional references are to Title 11 of the United States Code ("Bankruptcy Code").

[4] Vehifax argues in its summary judgment motion that the Agreement is a true lease. It does not address the issues of perfection nor Trustee's avoidance powers other than in identical footnotes in its supporting papers which read: "[a] like motion for summary judgment based upon the same facts and circumstances, but assuming (for the sake of argument only) that the subject Lease is a disguised secured transaction, will be made in the related Adversary Proceeding commenced by the Trustee against Signature Financial, LLC...." (FN 1 to Docs. 22-24, Vehifax Action). Signature argues in its summary judgment motion that it holds a first-priority perfected security interest in the Equipment not subject to the Trustee's avoidance powers. It does not address the issue of whether or not the Agreement is a true lease other than in identical footnotes in its supporting papers which read: "[a] like motion for summary judgment based upon the same facts and circumstances, but assuming that the subject Lease is a "true" lease, will be made in the related Adversary Proceeding commenced by the Trustee against Vehifax Corp....." (FN 1 to Docs. 20-22, Signature Action).

pleadings that raise common issues of law and fact. Accordingly, this decision addresses the competing Motions in both actions.

In addition to the pending Motions, the parties have submitted supplemental memoranda of law regarding whether Trustee waived the "buyer in the ordinary course of business" defense, which only becomes relevant if the Agreement is recharacterized as a secured transaction. Although not raised in its reply to Defendants' counterclaims, the Trustee argued in its papers on the pending Motions that Debtor took the Equipment from Vehifax free and clear of any security interest asserted by Signature as a "buyer in the ordinary course of business," thus subjecting the security interest to Trustee's § 544 avoidance powers. Defendants argue that this is an affirmative defense that the Trustee waived by her failure to plead it and that, in any event, Trustee cannot establish that Debtor was a buyer in the ordinary course of business.

### Summary Statement of the Court's Findings and Conclusions

For the reasons explained in this memorandum-decision, the court finds and concludes as follows: (1) the Agreement is a disguised secured transaction; (2) Trustee is granted leave to amend her pleadings in the Signature Action to incorporate a "buyer in the ordinary course of business" defense; (3) summary judgment is granted in favor of the Trustee in the Vehifax Action, including on all counterclaims with a reservation of rights in favor of Signature;[5] and (4) since the pleading stage is reopened with leave granted to the Trustee to amend her reply, summary judgment is denied on all remaining claims and the court sets a further pre-trial conference in the Signature Action for August 24, 2016, at 11:30 A.M., at which time the court shall address a scheduling order to include the need to reopen discovery and to set a trial date.

---

[5] To the extent that Vehifax has purported to assert on behalf of Signature its claim of perfected, secured status in the affirmative defenses pled in the Vehifax Action, dismissal of the action is without prejudice to Signature's identical, asserted claim of perfected, secured status in the Signature Action, which issue remains pending before the court.

3

*Jurisdiction*

The court's jurisdiction to hear and finally determine the issues raised in these adversary proceedings is based on 28 U.S.C. §§ 1334 and 157(b) (2) (K) and (O).

***Summary Judgment Standard and Burdens of Proof***

Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056, states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The moving party must support its assertions by citing to particular materials in the record which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c) (1) (A). Further, an affidavit in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56 (c) (4). "Where the moving party demonstrates the absence of a genuine issue of material fact" that would, as a matter of law, support the requested relief, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358 (internal citations omitted).

On summary judgment, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). Where, as here, the court is presented with cross motions for summary judgment, the court "is not required to grant judgment as a matter of law for one side or the

4

other," regardless of the parties' agreement that there are no genuine disputes as to any material

facts. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). The court must

consider each motion independently on its own merits and draw all reasonable inferences against

the party whose motion is under review. *Id.*

The court must also consider the burden of proof the moving party would face at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Here, although Defendants moved for

summary judgment and bear the initial burden of showing no genuine dispute as to any material

fact, the burden of recharacterizing the Agreement as a secured transaction rests with the Trustee.

*In re WorldCom, Inc.*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006) (noting that the burden of proof

at trial rests with the party contending that the agreement is something other than what it purports

to be).

### *Part I—Whether the Agreement Constitutes a True Lease or a Secured Transaction*

The record consists of the pleadings filed in the respective adversary proceedings as well

as the proceedings as noted in the Main Case that are a matter of public record and of which the

court takes judicial notice. [6]

---

[6] Subsequent to Defendants' Motions, all pleadings filed in both actions are identical. For ease of reference, and unless stated otherwise, this decision shall cite only to the record in the Vehifax Action. It consists of Plaintiff's ("Pl.") complaint (Doc. 1); Vehifax's amended answer and counterclaims (Doc. 16) ("Answer"); Pl.'s reply to counterclaims (Doc. 18); Aff. of Vehifax's Treasurer, Robert Allgier, sworn to on January 27, 2016, in support of Vehifax's motion for summary judgment ("Motion") and Exs. A-I (Doc. 22) ("Allgier Aff. 1"); Aff. of Signature's Vice President and Director of Vehicle Finance, Steven C. Jason, sworn to on January 27, 2016, in support of Vehifax's Motion and Exs. A-G (Doc. 23) ("Jason Aff."); Vehifax's statement of material facts (Doc. 24) ("Stmt."); Vehifax's memorandum of law ("Memo of Law") in support of its Motion (Doc. 25); Aff. of Pl.'s counsel, Attorney Edward Y. Crossmore, sworn to on March 1, 2016, in support of Pl.'s cross motion for summary judgment ("Cross Motion") and Exs. A-G (Doc. 31); Aff. of Debtor's chief executive officer ("CEO"), Jay DeLine, sworn to on February 23, 2016, in support of Pl.'s Cross Motion and Ex. A (Doc. 32) ("DeLine Aff."); Aff. of Debtor's chief financial officer ("CFO"), Michael Wieder, sworn to on February 23, 2016, in support of Pl.'s Cross Motion and Ex. A (Doc. 33) ("Wieder Aff."); Aff. of Pl. Trustee, Mary Lannon Fangio, sworn to on February 29, 2016, in support of Pl.'s Cross Motion and Ex. A (Doc. 34) ("Fangio Aff."); Pl.'s Memo of Law in support of its Cross Motion (Doc. 35); Pl.'s counterstatement of material facts (Doc. 36); Vehifax's Memo of Law in opposition to Pl.'s Cross Motion (Doc. 38); Aff. of Robert Allgier, sworn to on March 21, 2016, in support of Vehifax's opposition to Pl.'s Cross Motion (Doc. 39); Pl.'s supplemental Memo of Law (Doc. 49) and Vehifax's reply (Doc. 50).

### Undisputed Background Facts

Based upon the record, the court finds the following background facts to be undisputed. In June 2013, Debtor and Vehifax entered into the Agreement with respect to the Equipment. (Stmt., ¶ 12). Vehifax purchased the Equipment for $169,000, and paid an additional $5,000 commission. (Stmt., ¶ 16). The purchase was financed by Signature. (Stmt., ¶ 18). Concomitantly, Vehifax assigned its rights in the Agreement to Signature, giving Signature, *inter alia*, the right to enforce the Agreement and collect payments from the Debtor ("Assignment"). (Ex. F to Allgier Aff. 1). Based upon the Assignment, Debtor executed an authorization agreement for pre-arranged ACH payments to be made directly to Signature ("ACH Authorization"). (Stmt., ¶ 31). Signature filed UCC-1 financing statements with the New York Department of State against both Vehifax and the Debtor on which it asserted its security interests. (Stmt., ¶ 24). Signature retained possession of the original Agreement and all related documents. (Stmt., ¶ 25). The Agreement provides two waiver clauses by which Debtor waives the right to assert any defense, setoff, claim or counterclaim against any assignee or to challenge monthly payments. (Ex. A to Allgier Aff. 1, ¶¶ 5 and 15, respectively). The Agreement also provides that it is to be governed by New York law. (Ex. A to Allgier Aff. 1, ¶ 21).

The Agreement obligated Debtor to pay Vehifax $3,877 a month for forty-eight months. (Stmt., ¶ 28). Upon execution, Debtor paid Vehifax $18,149 in advance rent and fees. (Stmt., ¶ 29; Ex. A to Allgier Aff. 1). Upon maturity, Debtor had the option to either (i) purchase the Equipment for $16,900 ("Purchase Option") or (ii) return the Equipment at Debtor's expense to a "location designated by Lessor in [the] continuous [sic] 48 states of the United States…in the same condition and appearance as when delivered to Lessee, excepting only reasonable wear and

tear."[7] (Stmt., ¶ 38; Ex. A to Allgier Aff. 1, ¶¶ 17 and 19). Debtor was also obligated to continue making monthly payments of $3,877 until the Equipment was returned. (Ex. A to Allgier Aff. 1, ¶¶ 17 and 19). Debtor could only terminate the Agreement on thirty days' notice if not in default, and only after paying (i) all amounts then due and owing, (ii) any future payments to come due and (iii) the Purchase Option. (Ex. A to Allgier Aff. 1, ¶¶ 16 and 18).

Ancillary to the Agreement between Debtor and Vehifax, Vehifax and Signature entered into a loan agreement on June 11, 2013 ("Loan Agreement"), by which Vehifax was obligated to pay Signature $3,577 a month for forty-six months with a final payment of $16,900 at the Loan Agreement's end. (Stmt., ¶ 30). Under their respective obligations, Debtor owed Vehifax monthly payments of $3,877, and Vehifax owed Signature monthly payments of $3,577. (Stmt., ¶ 34). Pursuant to the ACH Authorization, Debtor would pay $3,877 a month to Signature. (Stmt., ¶ 34). Signature would apply $3,577 to Vehifax's monthly obligation under the Loan Agreement and then remit $300 to Vehifax as profit under the Agreement. (Stmt., ¶ 34).

Debtor made the first six monthly payments under the Agreement, then defaulted and failed to make any subsequent payments.[8] (Stmt., ¶ 35-36). Notwithstanding Debtor's default, Vehifax remained obligated to Signature under its Loan Agreement and has continued to make monthly payments of $3,577. (Stmt., ¶ 37).

Debtor was placed into a state court receivership on February 9, 2014, and an involuntary chapter 7 petition was filed against the Debtor on March 20, 2014. (Docs. 131 and 1, respectively, Main Case). An order of relief followed on June 4, 2014. (Doc. 53, Main Case). The case converted to chapter 11 and the Trustee was appointed on November 17, 2014. (Doc.

---

[7] Any quoted language that references the terms "lessor," "lessee," "lease" or any form thereof, is quoted verbatim and not determinative that the Agreement is a true lease.

[8] Debtor made monthly payments under the Agreement from July 2013 through December 2013. (Stmt., ¶ 37). Despite the ACH Authorization, Debtor's bank account on which the payments were drawn was depleted. (Ex. G to Stmt., p. 8).

170, Main Case). The Trustee hired an auctioneer on December 19, 2014, who conducted an auction sale thirty-one days later in Woodward, Oklahoma. (Doc. 200, Main Case). Two of the three pieces of Equipment were sold at auction. (Stmt., ¶ 48). The 410J Loader sold for $62,500 and the 310SJ Loader sold for $62,000. (Stmt., ¶ 48). The Skid Steer was not sold and has reportedly been missing since December 19, 2014. (Stmt., ¶¶ 53 and 50, respectively).

### *Disputed Background Facts Regarding Purchase Option*

The parties dispute whether the $16,900 Purchase Option constitutes nominal value for the Equipment—an essential element of Trustee's claim that the Agreement is not a true lease, but rather a disguised secured transaction.

Vehifax claims that the $16,900 Purchase Option was not nominal and that the Agreement was a true "lease." Vehifax's treasurer, Robert Allgier, claims that when the Agreement was being negotiated, he performed research "to give Vehifax a comfort level that the Leased Equipment would not be worth less than $16,900 at the end of the Lease under normal circumstances and normal wear and tear."[9] (Allgier Aff. 1, ¶ 24). Allgier claims that the amount of the Purchase Option was specifically requested by Debtor and was based solely on ten per cent of the original purchase price.[10] (Allgier Aff. 1, ¶¶ 24 and 22, respectively). In further support that the Purchase Option was not nominal and that the Agreement was a lease, Allgier also claims that Debtor, in a prior lease with Vehifax for a 2008 Peterbilt truck, requested a 10% end-of-term purchase option. (Allgier Aff., ¶ 23). Per Allgier, the Peterbilt truck was left off

---

[9] Allgier does not go into any further detail on the extent of his research and does not attach anything to his Affidavit as support for this assertion. Per Allgier's deposition testimony, attached as Ex. G to Vehifax's Stmt., none of this research was reduced to writing (Ex. G to Stmt., p. 25). Per Allgier, at the time Vehifax entered into the Agreement, Vehifax had no idea what the Equipment would be worth at the end of the forty-eight month term. (Ex. G to Stmt., p. 26) ("Four years after we purchase equipment we have no idea what this equipment's going to be worth.").

[10] This 10% figure excludes the $5,000 commission.

Debtor's balance sheet and monthly payments were listed as a "lease expense" on Debtor's profit and loss statement. (Allgier Aff., ¶ 23).

Conversely, based upon sworn testimony of Jay DeLine, Debtor's CEO, who has had twenty years' experience buying and selling similar items of Equipment, Plaintiff claims that the specified $16,900 Purchase Option is of nominal value. (DeLine Aff., ¶¶ 10-21). As signator of the Agreement, DeLine claims to have been aware of the Purchase Option at the outset. (DeLine Aff., ¶¶ 2 and 5). DeLine attests that at the end of the Agreement's term, he expected the Equipment to have a fair market value of three to five times the Purchase Option, with a useful life of at least three to five additional years. (DeLine Aff., ¶¶ 9-10). As further support that the Purchase Option was nominal, DeLine cites to the prices that the two backhoe loaders fetched at auction in January 2015, nineteen months after the Agreement's inception. (DeLine Aff., ¶¶ 13-15). The 2011 410J Loader, originally purchased for $71,000, sold for $62,500 and the 2011 310SJ Loader, originally purchased for $62,000, sold for $62,000. (DeLine Aff., ¶¶ 13-15).

DeLine also claims to have been involved in arranging to transport and pay for repairs to such equipment in the past. (DeLine Aff., ¶ 17). DeLine states that when he executed the Agreement, he anticipated that there would be substantive repair and transportation costs incurred for the Equipment at the time the Purchase Option was to be exercised. (DeLine Aff., ¶¶ 17-21).

> For example, if Vehifax required the Equipment [to] be returned from Oklahoma (where [Debtor] used the Equipment) to Five Star Equipment in Athens, Pennsylvania (the dealer through which the Equipment was purchased), the cost to [Debtor] of transporting the Equipment would be between $3,500 and $5,000 per each of the three items of Equipment.[11]

---

[11] Per DeLine, the price variation is based upon whether the trucker that transported the Equipment would be able to transport the Equipment alone, or would have other items to transport, reducing the cost. (DeLine Aff., ¶ 18).

(DeLine Aff., ¶ 18). Additionally, DeLine claims that repairs to the Equipment at the end of the Agreement's term would be substantial: "[f]or example, if a window were broken, the cost of repairing the window would run between $800 and $900. If a tire needed to be replaced, the cost of replacing the tire would be approximately $2,000." (DeLine Aff., ¶ 19). Without going into detail as to what kinds of repairs were expected, DeLine states that repair costs for all three items of Equipment were anticipated at the outset of the Agreement to be at a minimum between $10,000 and $15,000 at the time the Purchase Option was to be exercised. (DeLine Aff., ¶ 20). Furthermore, if Debtor decided not to exercise the Purchase Option, Debtor was not only obligated to make the repairs but had to continue making monthly payments until the Equipment was returned. Under this scenario, Debtor would end up paying an amount equal to or greater than the full $16,900 in just over four months. (Trustee's Memo of Law, p. 6). For these reasons, Plaintiff argues that the $16,900 Purchase Option is nominal and that Debtor's only reasonable course of action would have been to exercise the Purchase Option. *Id.*

Michael Wieder, Debtor's CFO, claims that he was involved in negotiating the Agreement's terms. (Wieder Aff., ¶ 2). Contrary to Allgier's sworn statement, Wieder does not recall requesting that the Purchase Option be ten per cent of the purchase price. (Wieder Aff., ¶ 5). He claims that Debtor intended that the Agreement be treated as a capital lease for accounting purposes. (Wieder Aff., ¶ 5). As stated by Wieder, "[t]o qualify as a capital lease, the lessee must have the ability to purchase the leased goods at lease end at a bargain price" and "[t]he $16,900 purchase price option was intended by [Debtor] to comply with this requirement." (Wieder Aff., ¶¶ 5-6).

10

***Discussion***

As a preliminary matter, the court disposes of Defendants' argument that Trustee's right to contest the Agreement has been waived by means of the two waiver clauses contained within the Agreement that apply to the Debtor. As correctly pointed out by the Trustee, Trustee is not acting as a successor in interest to the Debtor, but rather as a representative of Debtor's creditors. A pre-petition agreement that binds the Debtor cannot bind a Trustee from asserting an avoidance action since Debtor never had an interest in those causes of action which arose upon the filing of the case and belong to Debtor's creditors. *See In re Worldcom, Inc.*, 401 B.R. 637, 646-47 (Bankr. S.D.N.Y. 2009). Therefore, the waiver provisions do not limit the Trustee under these circumstances.

***Legal Standard for True Lease v. Secured Transaction***

Although the Bankruptcy Code contemplates the differences between true leases and secured transactions and the respective rights of the parties that flow from each, state law controls the classification of a contractual agreement as between the two. *In re WorldCom, Inc.*, 339 B.R. 56, 63 (Bankr. S.D.N.Y. 2006) (quoting *Powers v. Royce, Inc. (In re Powers)*, 983 F.2d 88, 90 (7th Cir.1993)) ("As courts have consistently recognized, whether a 'lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state law.' "). As dictated by the Agreement, New York law applies.

The court first looks to former New York Uniform Commercial Code ("NY UCC") § 1-201(37), which provides a two-prong "Bright Line Test" that, if satisfied, calls for the lease to be

11

recharacterized as a secured transaction.[12] *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998). The Bright Line Test looks to the substance of the transaction and not the parties' intent. *In re PSINet, Inc.*, 271 B.R. 1, 44 (Bankr. S.D.N.Y. 2001). If the Bright Line Test is not satisfied, then the court must apply a contextual analysis that examines the facts and circumstances of the case to determine if a security interest was, in fact, created. *In re WorldCom, Inc.*, 339 B.R. 56, 65 (Bankr. S.D.N.Y. 2006); *In re QDS Components, Inc.*, 292 B.R. 313, 333 (Bankr. S.D. Ohio 2002) (citing *In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 669 (Bankr. E.D. Tex. 2000)) ("If a court determines that the consideration of [the Bright Line Test] does not compel a conclusion that a security interest was created *per se*, it should proceed to an examination of all of the facts to determine whether the economic realities of a particular transaction create a security interest."). The key issue for the court to determine under the contextual analysis is " 'whether the lessor retains a meaningful residual interest' at the end of the lease term." *In re QDS Components, Inc.*, 292 B.R. at 333 (internal citations omitted).

### *Former New York UCC § 1-201(37) and the "Bright Line Test"*

Former NY UCC § 1-201(37) provides a two-prong Bright Line Test to determine whether a lease should be recharacterized as a security interest as follows:

> (a) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>> (i) the original term of the lease is equal to or greater than the remaining economic life of the goods,

---

[12] The current NY UCC § 1-203, which provides for the same Bright Line Test, was enacted on December 17, 2014, and applies only to transactions entered into on or after that date. 2014 N.Y. Sess. Laws § 51 (McKinney). Since the Agreement was entered into on June 7, 2013, the court looks to former NY UCC § 1-201(37), which is substantively similar to the current law per the current law's Official Comments. Additionally, because former NY UCC § 1-201(37) is identical to its counterpart in the Uniform Commercial Code ("UCC"), which was intended as a uniform law across the fifty states, the court shall consider the decisions of other states and federal courts interpreting the same. *In re WorldCom, Inc.*, 339 B.R. 56, 64 (Bankr. S.D.N.Y. 2006).

(ii)  the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(iv)  the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

### a.  First Prong – Term Not Subject to Termination

The first prong of the analysis requires a finding that the consideration given by Debtor for the term of the Agreement was not subject to termination. *In re WorldCom, Inc.*, 339 B.R. 56, 65 (Bankr. S.D.N.Y. 2006) (referring to NY UCC § 1-201(37)(a)). Since Debtor could not terminate the Agreement without paying all amounts then due and those that would become due, including the $16,900 Purchase Option, the court finds the first prong of the Bright Line Test to be satisfied.[13] *In re PSINet, Inc.*, 271 B.R. 1, 44 (Bankr. S.D.N.Y. 2001) (holding that because Debtor could not terminate the agreement without incurring an obligation to creditor for the full cost of the equipment, including the "buyout payment," the first prong of the Bright Line Test under UCC § 1-201(37) was satisfied); *In re QDS Components, Inc.*, 292 B.R. 313, 334 (Bankr. S.D. Ohio 2002) (similarly holding that the first prong of the Bright Line Test was satisfied because Debtor could not terminate the agreement without paying all monthly installments due under the full contract term and exercising the purchase option).

### b.  Second Prong – The Residual Factors

The second prong of the Bright Line Test requires a finding that any one of four mutually exclusive factors are met, referred to by many courts as the "residual factors." *In re WorldCom, Inc.*, 339 B.R. at 65 (referring to NY UCC § 1-201(37)(a)(i)-(iv)). If any one of the four residual

---

[13] In Vehifax's Memo of Law in support of its Motion, "Vehifax assumes (without admitting) that the first prong of the Bright Line Test (UCC § 1-201(37)(a)) can be satisfied." (Vehifax's Memo of Law, p. 9).

factors are met then the agreement is recharacterized as a secured transaction as a matter of law. *In re Uni Imaging Holdings, LLC*, 423 B.R. 406, 416 (Bankr. N.D.N.Y. 2010).

Trustee asserts that the fourth residual factor is met—namely, that the $16,900 Purchase Option constitutes nominal consideration. Defendants argue that Trustee should be precluded from arguing that any of the other residual factors apply due to Trustee's failure to plead them. Nevertheless, the court is obligated to consider each factor *sua sponte*. *See In re WorldCom, Inc.*, 339 B.R. at 65. The court finds, however, that residual factors (a) (i) through (a)(iii) are not met for the following reasons.

The first residual factor is that "the original term of the lease is equal to or greater than the remaining economic life of the goods." NY UCC § 1-201(37) (a) (i). The phrase "remaining economic life of the goods" is a phrase to be determined "with reference to the facts and circumstances at the time the transaction was entered into." NY UCC § 1-201(37) (c) (ii). Based upon the opposing affidavits submitted by the parties, the court finds that at the time the transaction was entered into, both parties expected that at the end of the four-year term, the Equipment would still retain some economic life.  Vehifax's Treasurer asserted that based upon his cursory research, the Equipment would be worth not less than $16,900 at the end of the Agreement's term. Similarly, Debtor's CEO claims that "at lease inception, each of the three items of Equipment…had a useful life of, at a minimum, three to five years beyond the end of the four year lease term." Therefore, the court finds that the first residual factor is not met.

The second residual factor states that "the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods." NY UCC § 1-201(37) (a) (ii). Debtor was not *bound* to renew the Agreement or become the owner of the goods. Debtor had the option to either (i) exercise the Purchase Option to become the owner of

14

the Equipment or (ii) return the Equipment to Vehifax at its own expense and continue making

monthly payments of $3,877 until the Equipment was returned. Therefore, the second residual

factor is not met.

The third residual factor states that "the lessee has an option to renew the lease for the

remaining economic life of the goods for no additional consideration or nominal additional

consideration upon compliance with the lease agreement." NY UCC § 1-201(37)(a)(iii). Here,

Debtor did not have the option to renew the Agreement and, thus, the third residual factor is not

met.

What remains then for the court's determination under the Bright Line Test is the fourth

residual factor—whether the $16,900 Purchase Option to become the owner of the Equipment

constitutes nominal consideration.

### c.  *The $16,900 Purchase Option*

The fourth and final residual factor is that "the lessee has an option to become the owner

of the goods for no additional consideration or nominal additional consideration upon

compliance with the lease agreement." NY UCC § 1-201(37) (a) (iv). Trustee argues that the

$16,900 Purchase Option in this instance constitutes nominal consideration.

Former NY UCC § 1-201 (37) (c) is instructive in informing the meaning of "nominal

consideration." It provides the following two explanations. First, additional consideration is *not*

nominal "when the option to become the owner of the goods…is stated to be the fair market

value of the goods determined at the time the option is to be performed." NY UCC § 1-

201(37)(c)(i)(B). If the option price is quantified as a sum certain—as it is here—then the option

price should be compared "not to the actual fair market value at the time the option is [to be]

exercised, but to what the parties thought the fair market value would be on the exercise date

when they entered into the lease." *In re APB Online, Inc.*, 259 B.R. 812, 819 (Bankr. S.D.N.Y. 2001). Second, "[a]dditional consideration *is* nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." *Id.* Notably, "reasonably predictable" is a phrase to "be determined with reference to the facts and circumstances at the time the transaction is entered into." NY UCC § 1-201(37) (c) (ii). In other words, in determining the reasonably predictable cost of performing under the Agreement, "the Court is to examine the economic realities of the transaction and the expectations of the parties…at the time they entered into the agreement, rather than the actual value [of the goods or cost of performance] at the conclusion of the term"—" '[f]oresight not hindsight controls.' " *In re Uni Imaging Holdings, LLC*, 423 B.R. 406, 417 (Bankr. N.D.N.Y. 2010) (quoting *In re Gateway Ethanol, L.L.C.*, 415 B.R. 486, 500 (Bankr. D. Kan. 2009)).

### i.    *Expected Fair Market Value of the Goods*

Trustee submits an Affidavit by Debtor's CEO who claims that when he signed the Agreement in June 2013, he expected the Equipment to have a fair market value of three to five times the $16,900 Purchase Option at the time the Purchase Option was to be exercised. In support of this statement, Trustee argues that the amount the Equipment sold for at auction is an indication as to how well the Equipment would have held its value for the Agreement's term. The court rejects this argument since the fair market value of the Equipment is to be measured with respect to the parties' expectations at the time the transaction was entered into. What the collateral actually sold for is immaterial. Furthermore, Debtor was placed into a state court receivership on February 9, 2014, and the Equipment most likely was not used since then. Therefore, the amount realized from the sale in January 2015—approximately one year after Debtor was placed into receivership—is not determinative of the parties' expectation as to what

16

the Equipment would have been worth if subjected to four years of "heavy use" as predicted by DeLine.

On the other hand, Vehifax's Treasurer claims that he performed some research at the time the Agreement was negotiated to ensure that the Equipment would have a fair market value of not less than $16,900 at the time the Purchase Option was to be exercised. It is not clear, however, if Allgier believed that the Equipment would have a fair market value of $16,900, or, if he anticipated that the Equipment would be worth more than that. According to Allgier's deposition testimony, he never reduced his research to writing and could not recall if his research indicated that the Equipment might be worth more than $16,900 at the end of four years. Vehifax merely felt "comfortable" with the ten per cent residual. Therefore, there is a genuine issue of material fact as to whether the Purchase Option was nominal as compared to the parties' anticipated expectation of the Equipment's value at the end of the Agreement's term.

### ii.   *Reasonably Predictable Cost of Performance*

No genuine issue of material fact exists, however, as to whether the Purchase Price was nominal as compared to Debtor's anticipated cost of performance under the Agreement had the Purchase Option not been exercised.

DeLine claims that based on his experience in the industry, the anticipated transportation and repair costs—as required under the Agreement if Debtor chose not to exercise the Purchase Option—were expected to be substantially more than the $16,900 Purchase Option. Therefore, according to DeLine, there was no economically sound alternative other than to exercise the Purchase Option. DeLine specifically claims that the cost of transporting the Equipment back to Vehifax was anticipated to cost $3,500 to $5,000 per each piece of Equipment—*i.e.* anywhere from $10,500 to $15,000. Additionally, DeLine estimates that the cost to fix a broken window

17

would run between $800 to $900 and it would cost approximately $2,000 to replace a tire. Although DeLine did not specify the repairs that were anticipated to be needed at the time the Purchase Option was to be exercised,[14] the expected transportation costs alone make the Purchase Option attractive.  By Vehifax's own admission, the Equipment would likely have been returned to the original dealer in Pennsylvania,[15]  halfway across the country from the lot in Oklahoma where the Equipment was located. The court agrees with the Trustee's characterization that this would be an expensive undertaking as compared to the Purchase Option.

Vehifax fails to counter Debtor's proof by failing to provide any countervailing evidence of its own estimation of what Debtor's cost of performance would have been. Rather, Vehifax argues that it was Michael Wieder, Debtor's CFO, who was directly involved in negotiating the Agreement's terms while DeLine merely executed it. Vehifax argues that DeLine's cost estimates were made in hindsight in response to the pending litigation in order to conform to the specific residual factor at issue. Vehifax, however, completely fails as the moving party to raise a genuine issue of material fact as to Debtor's projected cost to perform under the Agreement had the Purchase Option not been exercised—an essential element of the claim under the Bright Line Test. Notwithstanding Defendants' argument to disregard DeLine's testimony, the court accepts the contents of DeLine's sworn affidavit absent countervailing evidence that the information contained therein is incorrect.

From the evidence adduced, the court finds that the Purchase Option was nominal as compared to Debtor's reasonably predictable cost of performance entailing Debtor's obligation

---

[14] Per DeLine, the repair costs for all three items of Equipment were estimated to be, at a minimum, between $10,000 to $15,000.
[15] Ex. G to Stmt., p. 57 (Allgier's Deposition Testimony).

18

at its own expense to return the Equipment to any of the forty-eight contiguous states in the same condition, except for any reasonable wear and tear, as when the Equipment was purchased.

### The Contextual Analysis and Economic Realities of the Transaction

Should a reviewing court disagree with the court's finding that the Purchase Option was nominal under the Bright Line Test, the court concludes that a contextual analysis would render the same result. If the Bright Line Test is not satisfied, the court must perform a contextual analysis which looks to the economic realities of the transaction to see if a security interest was created. *In re WorldCom, Inc.*, 339 B.R. 56, 65 (Bankr. S.D.N.Y. 2006); *In re QDS Components, Inc.*, 292 B.R. at 333. Primarily, the court must determine whether Vehifax retained a meaningful reversionary interest in the Equipment at the end of the Agreement's term. *In re WorldCom, Inc.*, 339 B.R at 71. If not, then Vehifax can be said to have had no interest in the "economic value or remaining useful life of the goods," and, therefore, transferred title to the Equipment "in substance if not in form" *Id.* at 72. The pivotal question, "[i]n other words, is the transaction structured in such a way that the lessor [had] an objectively reasonable economic expectation that the goods [would] come back to it at the end of the lease term?" *In re Ecco Drilling Co., Ltd.*, 390 B.R. 221, 227 (Bankr. E.D. Tex. 2008).

Trustee argues that Vehifax expected Debtor to exercise the Purchase Option, *i.e.* that Vehifax had no reversionary interest in the Equipment, because Vehifax was obligated to pay Signature $16,900 at the Loan Agreement's end—the same time as when the Purchase Option would become due under the Agreement. The economic reality of the situation is that Vehifax must have anticipated that Debtor would exercise the Purchase Option. Otherwise, it would make no economic sense for Vehifax to obligate itself to Signature for $16,900 upon maturity of the Loan Agreement.

19

Additionally, Trustee argues that had Debtor not exercised the Purchase Option nor returned the Equipment, Debtor would have paid the full amount of the Purchase Option in a little over four months pursuant to Debtor's obligation to continue making monthly payments under the Agreement. After forty-eight monthly payments, a mere four more to become the owner of three pieces of John Deere Equipment seems more than reasonable and likely. Again, the economic reality of the situation is that Debtor's reasonably foreseeable course of action was to exercise the Purchase Option.

Vehifax argues that Debtor intended the Agreement to be a lease because Debtor treated a prior agreement concerning a 2008 Peterbilt as a lease. The court rejects this argument. The prior transaction regarding the Peterbilt is an entirely separate transaction and without proof of any nexus, the court refuses to treat this Agreement as a "lease" just because Debtor treated a separate transaction as one. Ultimately, this argument ignores the economic realities of the Agreement at issue, which, under a totality of the circumstances, leads the court to recharacterize the Agreement from a "lease" to a secured transaction.

### *Counterclaims for Post-Petition Lease Payments and Turnover of Sale Proceeds*

As a matter of law, since the Agreement is a secured transaction and not a true lease, Debtor is not liable for post-petition lease payments under § 365(d)(5). *See In re PCH Associates*, 804 F.2d 193, 200 (2d Cir. 1986). Summary judgment, therefore, is granted in favor of the Trustee on the counterclaim asserted in both the Vehifax and Signature Actions which seek post-petition lease payments from the Debtor.

Since the court has found a secured transaction, Vehifax is not entitled to the Equipment sale proceeds as owner or purported "lessor" of the Equipment. Secured transactions are governed by Article 9 of the Uniform Commercial Code, which requires perfection in order to be

protected from third parties asserting an interest in the same collateral. *See* Official Comment to N.Y. U.C.C. Law § 2-A-101 (McKinney). Here, Vehifax did not file a UCC-1 financing statement with respect to the Equipment.   Therefore, Vehifax does not have any rights to the Equipment sale proceeds vis-à-vis the Trustee. The court grants summary judgment in favor of the Trustee and dismisses Vehifax's counterclaim for turnover. As discussed *infra*, the court does not address in this decision the issue of Signature's claim for turnover of sale proceeds in the Signature Action.

### *Leave to Amend the Pleadings*

Based upon the possibility that the court would recharacterize the Agreement, Trustee has asked for leave to amend her pleadings to incorporate a "buyer in the ordinary course of business" defense. Trustee seeks to invoke the defense to argue that Debtor took the Equipment free and clear of Signature's perfected security interest as a buyer in the ordinary course of business, thus making the Equipment subject to Trustee's § 544 avoidance powers. Defendants vehemently oppose the request, arguing (i) that the defense is an affirmative defense which was waived by Trustee's failure to affirmatively plead it, or, in the alternative, (ii) that Trustee would be unable to establish that Debtor was a buyer in the ordinary course of business, and, therefore, Trustee's assertion of the defense is to no avail.

The Second Circuit has held that a "buyer in the ordinary course of business" defense is an affirmative defense that must be affirmatively set forth in a responsive pleading under Fed. R. Civ. P. 8(c). *United States v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1254 (2d Cir. 1989). Generally, failure to plead an affirmative defense results in a waiver of that defense. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984). However, Fed. R. Civ. P. 15(a) provides that a party may amend its pleading if granted leave by the court. Under the Rule, "[t]he

court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a) (1) (B). As stated

by the United States Supreme Court:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper
> subject of relief, he ought to be afforded an opportunity to test his claim on the
> merits. In the absence of any apparent or declared reason—such as undue delay,
> bad faith or dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice to the opposing
> party by virtue of allowance of the amendment, futility of amendment, etc.—the
> leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182 (1962).

Here, the court does not find a dilatory motive on behalf of the Trustee nor any legitimate

surprise nor prejudice to Defendants in allowing leave to amend. Although not raised in response

to Defendants' respective answers and counterclaims, the defense was raised in opposition to

Defendants' summary judgment motions which Defendants subsequently addressed on the merits

in their respective replies. Defendants were also afforded the opportunity to brief the issue

further, which they did. Defendants shall have ample opportunity to respond to the merits of the

defense when raised and to conduct any additional discovery necessary.

Therefore, in the interest of justice and in accordance with the Second Circuit's holding

in *United States v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago,* 889 F.2d 1248, 1255 (2d

Cir. 1989), Trustee is granted leave to amend her reply to Signature's counterclaims to

specifically plead the defense and allow this court to ultimately decide the issue presented on the

merits. The burden shall be on the Trustee to establish that Debtor was a good faith purchaser,

without knowledge that the sale was in violation of the ownership rights or security interest of

Signature, and that the Equipment was bought in the ordinary course from someone in the

business of selling goods of that kind. *See id.* at 1253 (2d Cir. 1989); N.Y. U.C.C. § 1-201(b)(9).[16]

### *Part II—Counterclaim Against the Trustee Involving the Missing Skid Steer*

#### *Background Facts*

Trustee Fangio was appointed on November 17, 2014, and within a little over two weeks, noticed a § 363 sale motion on December 4, 2014, and requested the appointment of an auctioneer ("Sale Motion"). (Docs. 173 and 180, respectively, Main Case). The Sale Motion proposed to sell certain assets of the Debtor, including the Equipment. (Doc. 180, Main Case). The list of collateral proposed to be sold is identical to the list of items originally proposed to be sold by the Debtor in an earlier motion that was returnable before the court on the same day that the court ordered appointment of a chapter 11 trustee. (Ex. A to Doc. 131, Main Case). Pursuant to this court's order of December 19, 2014 granting the Sale Motion ("Sale Order"), Debtor's assets were permitted to be auctioned in either Woodward, Oklahoma, Odessa, Texas or East Syracuse, New York.[17] (Doc. 200, Main Case). Although the Skid Steer was included in both the Sale Motion and the Sale Order, it was not present at any of the three auctions and is currently unaccounted for. (Stmt., ¶¶ 50 and 56). [18]

It is undisputed that the Missing Skid Steer was physically observed on the Woodard, Oklahoma lot on September 7, 2014, by Mr. Kelly C. Bullin, an agent engaged by the court-appointed auctioneer. (Stmt., ¶ 51). It was also physically observed on the Woodard, Oklahoma lot by an agent of Vehifax on September 17, 2014. (Stmt., ¶ 52). The Missing Skid Steer was

---

[16] The court notes that the first UCC-1 financing statement filed by Signature against Vehifax on May 8, 2012, which noted its interest generally in "EQUIPMENT," clearly states that the "SALE OF COLLATERAL BY [VEHIFAX] IS PROHIBITED." (Ex. C to Doc. 21, Signature Action).

[17] Pursuant to an amended order appointing auctioneer and approving the terms of proposed auction sales, the location of the Odessa, Texas auction was changed to San Angelo, Texas. (Doc. 238, Main Case).

[18] The Missing Skid Steer was listed as item no. 46 to be sold at either the Oklahoma or Texas auction. (Docs. 180 and 200, Main Case).

physically inspected and photographed by both individuals on the above-mentioned dates. (Stmt., ¶¶ 51 and 52).

The parties agree that the Skid Steer was discovered missing from the Woodward, Oklahoma lot on December 19, 2014—the same day the Sale Order was entered—when Mr. Bullin returned to inspect and prepare Debtor's equipment for auction. (Stmt., ¶ 53). Per Mr. Bullin, William Toellner, the lot's owner, told him that the Skid Steer had been taken by a creditor. (Stmt., ¶ 54). Mr. Bullin's testimony was corroborated by John Stuart Sawyer, Special Assets Manager of Diversified Lenders, Inc.,[19] who visited the Woodward, Oklahoma lot with Mr. Bullin on December 19, 2014. (Stmt., ¶ 55).[20]

Despite the parties' agreement to the above recitation of facts, Trustee Fangio states that she did not learn of the Skid Steer's disappearance until some time after February 17, 2015. (Fangio Aff., ¶ 18). No one reported to Trustee Fangio on December 19, 2014, that the Skid Steer was no longer at the Oklahoma lot. (Fangio Aff., ¶ 18). Per the Trustee, while other items of equipment were reported missing by the auctioneer prior to the Oklahoma auction, the Skid Steer was not one of them. (Ex. K to Stmt., p. 17). Trustee Fangio provided Vehifax's counsel with a copy of the Oklahoma auction report on February 17, 2015.[21] (Fangio Aff., ¶ 10). That same day, there was a flurry of email exchanges. (Ex. A to Fangio Aff.). Vehifax's counsel inquired as to why only two of the three items of Equipment had been sold at the Oklahoma auction. (Fangio Aff., ¶ 11). Trustee Fangio emailed the auctioneer to inquire about the same and was told that the Skid Steer was listed as being located in San Angelo, Texas—the auction which

---

[19] Diversified Lenders, Inc. is the parent company of DivLend Equipment Leasing, L.L.C., another creditor of the Debtor.

[20] Nothing in the record of either adversary indicates exactly when the Missing Skid Steer was actually taken from the lot. However, the court notes that in an Affidavit by Robert Allgier submitted in Debtor's Main Case, Allgier claims to have spoken with a man named "Stacey" at Mr. Toellner's yard who said that the Missing Skid Steer was on the lot the day of the Oklahoma auction and that someone came and picked it up the following day. (Doc. 271, ¶ 3, Main Case).

[21] The Woodward, Oklahoma auction took place on January 21, 2015. (Fangio Aff., ¶ 25(a)).

was yet to take place.[22] (Fangio Aff., ¶¶ 13-14). The Trustee relied upon the professional she had

hired. The Trustee emailed this information to Vehifax's counsel. (Ex. A. to Fangio Aff.). When

Vehifax's counsel inquired further of Trustee Fangio as to why the Skid Steer had been moved

from Oklahoma to Texas, Trustee Fangio replied that she would look into the situation further.

(Ex. A to Fangio Aff.). Subsequently, Trustee Fangio learned that the Skid Steer was in fact

missing.[23] Trustee Fangio attempted contacts with the lot owner, Mr. Toellner, but he provided

no information and none of his employees would speak with her. (Fangio Aff., ¶ 27).

### *Discussion*

Defendants both assert a counterclaim for damages against the Trustee personally for the

missing Skid Steer, alleging that the Trustee failed to exercise reasonable diligence in the

performance of her statutory duties.

A trustee is statutorily obligated "to protect and preserve property of the estate for the

purpose of maximizing a distribution to creditors." *In re Ngan Gung Rest.*, 254 B.R. 566, 570

(Bankr. S.D.N.Y. 2000) (citing 11 U.S.C. § 1106(a)). In the Second Circuit, bankruptcy trustees

may be held personally liable for "deliberate or negligent acts or omissions which harm the

bankruptcy estate." *In re Ngan Gung Rest.*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000). They

may not be held personally liable for acting in accordance with their business judgment. *In re

Ctr. Teleproductions, Inc.*, 112 B.R. 567, 578 (Bankr. S.D.N.Y. 1990). Ultimately, a trustee will

only be held personally accountable when acting in an "objectively unreasonable manner." *In re

Ngan Gung Rest.*, 254 B.R. at 571 (internal citations omitted).

---

[22] The San Angelo, Texas auction took place on March 25, 2015. (Fangio Aff., ¶ 25(c)).

[23] It is unclear from Trustee's Affidavit as to when and how she discovered that the Skid Steer was in fact missing.
Per paragraph 18 of Trustee's Affidavit, "[l]ater, your deponent learned that the Skid Steer had been removed from
the Woodward, Oklahoma yard by a party unknown to your deponent at some date between September 17, 2014 and
December 19, 2014."

Here, Defendants argue that Trustee should be held personally liable for representing in both the Sale Motion and Sale Order that the Missing Skid Steer was accounted for when Trustee never personally investigated the matter prior to the Oklahoma auction. Additionally, Defendants take issue with the fact that Trustee did not provide the Oklahoma auction report until February 17, 2016, approximately one month after the auction took place. Trustee maintains that she acted diligently under the circumstances and took reasonable steps to investigate the matter after it was brought to her attention. Moreover, Trustee points out that she was not appointed until November 17, 2014. Although the Skid Steer was discovered missing on December 19, 2014, the Skid Steer was last observed in the storage yard in the Woodward, Oklahoma lot on September 17, 2014. There is no conclusive evidence as to when the Missing Skid Steer disappeared from the yard and it may well have disappeared or been stolen prior to the Trustee's appointment.

There are several outstanding factual issues surrounding the Skid Steer and the record is devoid of a sufficient nexus to attribute its disappearance to any act or omission of the Trustee. If the Skid Steer went missing before the Trustee was appointed, then Trustee cannot be held personally liable as a matter of law.[24] On the other hand, if the Skid Steer disappeared after Trustee was appointed, the swiftness with which the Trustee acted to collect the assets of the estate, retain a third-party bonded auctioneer to conduct auction sales of estate property and conclude a sale process does not permit an inference that the Trustee can be held personally liable on these facts. Based upon the record, it appears that a third party intervened to remove the Skid Steer in direct violation of the automatic stay—an act that the Trustee cannot be expected to police and for which she is not responsible.

---

[24] Under § 704(a)(2) as incorporated by § 1106(a)(1), a Trustee shall be accountable for all property received. If the Skid Steer went missing prior to Trustee's appointment, then it was never received.

Vehifax argues that had the Trustee discovered sooner that the Skid Steer was missing, then Vehifax would have been able to investigate the situation while the incident was still fresh in the minds of those who may have had knowledge and been involved—including the lot owner and his employees. What Trustee should have done, per Defendants, is independently verify with the auctioneer the items to be sold prior to the January 21, 2015, auction. This argument fails, however, to meet the standard that Defendants ultimately must prove—that Trustee's actions were "objectively unreasonable." Under the circumstances, the court finds that Trustee reasonably relied (i) on the list of collateral that Debtor prepared in anticipation of a bulk sale that never took place and (ii) on the professional she hired to conduct the auction. Both were an exercise of Trustee's sound business judgment and it was ultimately the auctioneer's responsibility to verify the collateral to be sold, particularly when the assets were located half-way across the country and in different states.

Defendants' argument also ignores their independent responsibility to monitor their own collateral. Per the auction agreement, as approved by the Sale Order ("Auction Agreement"), "any…party asserting a lien or security interest in any Equipment or Vehicles or a lease interest in any Equipment or Vehicles, shall have the right to inspect such Equipment or Vehicles while Alex Lyon is preparing the Equipment or Vehicles for auction…." Apparently, Defendants never took advantage of this right nor had a representative present at the Oklahoma auction. Rather, Defendants chose to rely solely upon the list of Debtor's assets attached to the Sale Motion and Sale Order, without any independent verification. Per Vehifax, it was prevented from "securing" its collateral due to the automatic stay. The stay, however, did not prevent Vehifax from exercising its rights to inspect its collateral as provided for in the Auction Agreement. The court

will not hold the Trustee personally liable when Defendants failed to exercise their own due diligence in this regard.

Additionally, Trustee may have rightfully presumed that any missing collateral would have been reported to her when, according to Trustee's sworn testimony, other items of equipment were reported missing by the auctioneer prior to the Oklahoma auction. The auctioneer was appointed as an agent of the Trustee to assist her in carrying out her statutory duties and was bonded in the amount of $1,500,000. By going against the Trustee personally, Defendants must establish Trustee's negligent or willful acts which none of the facts suggest. Trustee's decision to use Mr. Toellner's lot in Woodward, Oklahoma was an exercise of the Trustee's sound business judgment. Once brought to her attention, the Trustee acted immediately to investigate the situation. The suggested inference that an intervening third party absconded with the collateral in violation of the automatic stay and that the auctioneer failed to notify the Trustee of the same does not necessitate a finding that Trustee was negligent. Ultimately, Trustee did not act or fail to act in any manner that this court finds to be "objectively unreasonable."

Beyond a violation of the automatic stay, the unknown facts regarding the missing Skid Steer, which constitutes estate property, may implicate Title 18 of the United States Code.[25] The court is troubled by the Trustee's statements under oath that Mr. Toellner's employees, who are under his authority, refused to cooperate with the Trustee in her investigation. Although almost two years have passed, a further investigation as to the missing asset at the instance of this court should be pursued. Mr. Toellner is expected to fully cooperate with the Trustee in this investigation. Should the court be advised by the Trustee that Mr. Toellner continues to refuse to cooperate, the court shall issue a separate order to show cause that directs Mr. Toellner to

---

[25] Title 18 to the United States Code is the criminal and penal code of the United States and deals specifically with federal crimes.

personally appear and testify before the court regarding the missing Skid Steer and his knowledge of the same as reported by third parties.

Defendants argue that Trustee should have provided the auction report sooner. Pursuant to the approved Auction Agreement "Alex Lyon [the court appointed auctioneer] will submit the report required by Local Rule 6005-1(c) within 30 days following each auction." The Oklahoma auction took place on January 21, 2015, and the auction report was provided to Defendants on February 17, 2015. Based upon the auctioneer's thirty-day window to provide the report, the court finds that Trustee was not negligent and acted within a timely manner in providing the report to Vehifax.

Ultimately, although there are outstanding, factual issues surrounding the Skid Steer's disappearance, none are material as to the Trustee's personal liability. The court shall separately grant summary judgment to the Trustee dismissing, respectively, Defendants' third and fourth counterclaims in the Vehifax and Signature Actions.

***Conclusion***

In accordance with Fed. R. Civ. P. 58, the court shall enter separate judgments as follows:

(1) In the Vehifax Action, summary judgment shall be granted in favor of the Trustee and all counterclaims dismissed, finding that the Lease Agreement constitutes a secured transaction, with a reservation of rights as to Signature's claim that it holds a perfected, first-priority security interest in the Equipment and sale proceeds;

(2) In the Signature Action, partial summary judgment shall be granted in favor of the Trustee, finding that the Lease Agreement constitutes a secured transaction and dismissing counterclaims 1, 3, and 4, with leave granted to Plaintiff to amend her pleadings to affirmatively plead a buyer in the ordinary course of business defense.

A pre-trial conference shall be held in the Signature Action on August 24, 2016 at 11:30 A.M. at the United States Bankruptcy Court, 100 South Clinton Street, Syracuse, New York to consider entry of a scheduling order, addressing the need for further discovery and setting a date for trial on the remaining issues.

So Ordered.

Dated:  August 4, 2016
        Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge

30